**Diane Stolbach, Esq. (DS1439)**
**KRAEMER, BURNS, MYTELKA, LOVELL & KULKA, P.A.**
**675 MORRIS AVENUE**
**SPRINGFIELD, NEW JERSEY 07081**
**(973) 912-8700**
**ATTORNEYS FOR Defendant, BioBancUSA**

IN THE UNITED STATES DISTRICT COURT OF THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT O'BRIEN<br><br>     Plaintiff<br><br>v.<br><br>BIOBANCUSA, BIOBANK OF AMERICA, INC., IMMUNE SYSTEMS USA, ABC CORPORATIONS 1-5, DEF PARTNERSHIPS 1-5, and GHI LIMITED LIABILITY COMPANIES 1-5<br><br>     Defendants | CIVIL NO.  09-2289 (RBK/KMW)<br><br><br>CERTIFICATION OF<br>DIANE STOLBACH |

I, DIANE STOLBACH, certify that:

1.     I am an attorney at law of the State of New Jersey and a shareholder in the firm of Kraemer, Burns, Mytelka, Lovell & Kulka, P.A., attorneys for defendant, BioBanc USA.  I submit this Certification in support of BioBanc USA's motion for summary judgment.

2.      Attached as Exhibit A is a copy of the May 17, 2006 Agreement.

3.      Attached as Exhibit B is a copy of a February 19th, 2009 check in the amount of $10.00 payable to BioBanc USA  from Robert O'Brien.

4.      Attached as Exhibit C is an e-mail dated March 27, 2009 from Nolan Kennedy, Esq., counsel for BioBanc USA to John O'Brien.

5.      Attached as Exhibit D is a March 13, 2009 letter from Robert E. O'Brien to the California Department of Corporations and an attached complaint.

6.      Attached as Exhibit E is a letter dated December 17, 2009 from Diane Stolbach to Mr. Colin G. Bell and attachments.

7.      The discovery end date in this matter is January 4, 2010.  Plaintiff has no outstanding discovery requests directed to the Defendant at this time.  Plaintiff's deposition has been noticed and rescheduled several times but Plaintiff has not agreed to appear for his deposition or produce certain documents.  There is a telephone conference with Magistrate Williams set for December 28, 2009 at which point outstanding discovery from Plaintiff will be addressed.

I certify under penalty of perjury that the foregoing is true and correct.


Dated: December 24, 2009                        /s/ Diane Stolbach
                                                Diane Stolbach (1439)

# EXHIBIT A

## AGREEMENT

Agreement regarding the relationship between Thomas B. O'Brien (hereinafter referred to as "TOB"), Immune Systems USA, a California corporation. dba BioBancUSA and BioBank of America, a California corporation (hereinafter collectively referred to as "BIO"), and Sankhia International INC.(hereinafter referred to as "SAN").

This Agreement is intended to amend and replace in their entirety the March 5, 2006 Agreement by and between BioBank of America, a California corporation and TOB and the Memorandum of Understanding dated January 22, 2006, between SAN. TOB and BIO and to establish all outstanding agreements between TOB, BIO and SAN.

In consideration of One Million Dollars ($1,000,000.00), TOB will release now and forever any claims or warrants he has against BIO or SAN which claims or warrants are in existence as of the date hereof. Seven Hundred Twenty Five Thousand ($725,000.00) will be wire transferred by SAN (corresponding to the two promissory notes the first for $625,000 and the second for $100,000) and Two Hundred Seventy Five Thousand ($275,000.00) from BIO to TOB not later than May 30, 2006, to an account identified by TOB.

SAN will issue a warrant for five percent (5%) of its common stock to TOB at a Twelve Million Five Hundred Thousand Dollar ($12,500,000.00) valuation for the sum of Ten Dollars ($10.00) paid and received. This warrant can be exercised by TOB anytime prior to May 16, 2007.

BIO is released from any and all of its obligations to reimburse and/or pay for TOB's expenses to include but not be limited to: house lease in the monthly amount of $3,200.00 and a one-time $20,000.00 fee for all other expenses related to TOB's expenses incurred on behalf of BIO.

The promissory notes between BIO, SAN and TOB will be considered paid in full as a result of the Seven Hundred Twenty Five Thousand ($725,000.00) payment by SAN to TOB.

TOB confirms his resignation from employment and as a member of the Board of Directors of BIO effective March 5, 2006.

Rob O'Brien's has a 3 year warrant to purchase 2% of the common stock of BIO at a 12.5 million valuation for $10.

1

TOB hereby releases SAN and BIO from any and all claims whether in existence now or in the future, including claims which would otherwise be barred in accordance with the provisions of California Civil Code Section 1542 arising out of any relationship with BIO and/or SAN and their shareholders, directors, officers, employees or agents. California Civil Code Section 1542 provides as follows:

> Section 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

                                        TOB

Dated: 5-17-06                          Thomas B. O'Brien


                                        SANKIA

Dated: MAY 17, 2006                     By:
                                            Patrick Raynbaud
                                            Chief Executive Officer


                                        IMMUNE SYSTEMS USA
                                        A California Corporation
                                        dba BioBank USA
Dated: MAY 17 2006                      By:
                                            Robert E. Haynter
                                            Chief Executive Officer


                                        BIOBANK OF AMERICA
                                        A California Corporation
Dated: 5/17/06                          By:
                                            Robert Keller
                                            President

                                        2

# EXHIBIT B

ROBERT E. O'BRIEN
801 E. MILLBRIDGE CT.
SMITHVILLE, NJ 08205

690

15-136/212
21

Date _2/19/09_

Pay to the
Order of _Biobancusa_          | $ _10.00_

_Ten     and     00/100_ ————————— Dollars

**Commerce Bank** America's Most Convenient Bank®
1-800-YES-2000

For _Warrant_

⑈031201360⑈    786036 2073⑈  0690

FNB
**FIRST NATIONAL BANK**
OF CENTRAL CALIFORNIA
SINCE 1906

First National Bank
Monterey Office
495 Washington Street
Monterey, CA 93940-3038
Phone: (800) 495-7100

Date: 02/23/2009
Time: 14:21:21
Seq: 99
Checking Deposit
Acct No: xxxxx8612
Amount: $10.00
herodr
303101

THANK YOU FOR BANKING WITH US

Your Deposit may not be available
for immediate withdrawal

**D-18**

# EXHIBIT C

**Sutton, Art**

**From:** Nolan Kennedy [nkennedy@kahlaw.net]

**Sent:** Friday, March 27, 2009 10:01 AM

**To:** John O'Brien

**Subject:** RE: BioBancUSA

Attached per our discussion this morning is the information you are requesting on BioBancUSA in order to assess the investment by Rob O'Brien.  This will confirm that, pursuant to the warrant commitment in the May 17, 2006 agreement, BioBancUSA will sell up to 2,000 shares of its common stock to Rob O'Brien at a price of $125 per share.

To complete the transaction, Mr. O'Brien must return the fully completed and signed Subscription Agreement and Investor Questionnaire, together with payment by cashier's check or wire transfer for the amount of stock which he elects to purchase.  He must qualify as an accredited investor under applicable securities laws, which must be demonstrated by his responses to the questions in the Investor Questionnaire; and must also qualify as a Subchapter S shareholder under the Internal Revenue Code.  If he does not meet the qualification requirements, the payment he sends will be returned to him

Under the agreement, Mr. O'Brien has until May 16, 2009 to complete the stock purchase.

Nolan M. Kennedy
Attorney at Law
KENNEDY, ARCHER & HARRAY
24591 Silver Cloud Court, Suite 200
Monterey, California  93940
Tel:  (831) 373-7500
Fax:  (831) 373-7555
nkennedy@kahlaw.net
http://www.kahlaw.net

# EXHIBIT D

# ROBERT E. O'BRIEN
801 E. Millbridge Ct.
Galloway, NJ 08205
(609) 404-1343

March 13, 2009

Department of Corporations
Consumer Services Office
1515 K Street, Suite 200
Sacramento, CA 95814

RE: Biobanc USA – Complaint

People,

Please find the enclosed complaint.  It clearly outlines a pattern of obfuscation with the intent to defraud me from exercising my securities position.

Please contact me to apprise me of any progress.

Thank you,

Robert E. O'Brien

STATE OF CALIFORNIA -- BUSINESS, TRANSPORTATION AND HOUSING AGENCY

## DEPARTMENT OF CORPORATIONS
Complaint Form
Page 1 of 2

# Complaint Form

1. **Your Information** (type or print clearly):

   ☒ Mr.   ☐ Miss   ☐ Ms.   ☐ Mrs.

   _Robert E. O'Brien_
   Print Your Full Name (First, MI, Last)

   _401 E. Millbridge Ct. Galloway, N.J. 08205_
   Your Home Address (Street, City, State and Zip Code)

   Your Business Address (Street, City, State and Zip Code)

   _(609) 404-1343_
   Business Phone                            Home Phone

   _Same as home_          _robsteph1_252@MSN.com_
   Daytime Phone                             E-mail Address

   Your age (please check one):   ☒ Under 50   ☐ 50 – 64   ☐ 65 and Over

   ┌─────────────────────────────────────────────────────────┐
   │ **For Military Personnel Only:**                          │
   │                                                           │
   │ Branch of Service                    Rank                 │
   │                                                           │
   │ Base Address (where you are stationed)                    │
   └─────────────────────────────────────────────────────────┘

2. **Information on the individual or organization about which you have a complaint:**

   _Biobancusa_
   Full Name of Business, Company, Firm, or Person

   _5 Lower Ragsdale Drive   Suite # 100_
   Street Address of Business, Company, Firm or Person (include Room #, Suite #, or Apt. #, if any)

   _Monterey_     _CA_     _93940_     _(831) 646-2262_
   City          State      Zip Code    Business Phone

   _Arthur A. Sutton CFO_
   Full Name of Salesperson, Agent or Other Representative (if applicable)

   _Robert Hayner CEO_
   Employer of Salesperson, Agent or Other Representative (if different than Business Name above)

STATE OF CALIFORNIA – BUSINESS, TRANSPORTATION AND HOUSING AGENCY

## DEPARTMENT OF CORPORATIONS
Complaint Form
Page 2 of 2

3. **Have you already directly contacted the business, firm or individual(s) regarding your complaint?**

   ☒ Yes     ☐ No

   If yes, include the names of the persons contacted and the dates you contacted them; attach **copies** of all documents relating to this correspondence. If necessary, attach extra pages.

   | Name of Person(s) Contacted | Date(s) Contacted |
   |---|---|
   | Arthur A. Sutton | |
   | Robert Hayner | |

   What was the result of the contact (if any)? _Inconclusive_

4. **Have you filed a lawsuit or arbitration regarding this complaint?**

   ☐ Lawsuit     ☐ Arbitration     ☒ Neither

5. **Briefly describe your complaint.** Answer the questions of "who," "what," "where" and "when." Include the full names, addresses, and telephone numbers of any witnesses present during the transactions, and dollar amounts invested and/or lost. **If necessary, attach extra pages.**

   _SEE ATTACHED_

6. **What do you believe would be a fair resolution to this matter?**

   _CASHLESS EXERCISE of my WARRANT - SEE ATTACHED_

7. **How did you find out about the Department of Corporations?**

   ☐ Seniors Against Investment Fraud (SAIF)     ☐ Troops Against Predatory Scams (TAPS)

   ☒ Other (please state) _Internet_

8. **Attach a copy of all written correspondence and documentation related to your complaint.**

9. **SIGNATURE**

   In filing this complaint, I agree the information provided is true and correct to the best of my knowledge and that the information may be used by the Department to further investigate my complaint. I understand that the Department of Corporations' investigations are generally confidential and in some cases it is necessary for the Department to send my complaint to the licensee.

   _3/13/09_
   Date                     Signature

DOC 29 (Rev. 11/08)

COMPLAINT AGAINST BIOBANCUSA
BEFORE THE CALIFORNIA DEPARTMENT OF CORPORATIONS
SUBMITTED BY ROBERT E. O'BRIEN

Please review the Complaint Form (DOC 29) attached.

Summary:

Robert O'Brien ("ROB") was granted a Warrant ("the Warrant") to purchase two
(2) percent of BiobancUSA ("Biobanc") at a valuation of $10 million on March 5,
2006 (Exhibit 1). The Warrant was then memorialized again with somewhat
different terms[1] on May 17, 2006 (Exhibit 2). In both documents the term of the
Warrant was for three (3) years. Offers were made to purchase all or a portion of
the Warrant by management over a period of 3 years, but ROB decided to retain
the Warrant believing that it would become more valuable over time. During the
past year numerous attempts were made to obtain the Warrant as discussed and
documented below. Rather than respond in any reasonable fashion, Biobanc
obfuscated, delayed, and all but ignored all requests. During that period Biobanc
was actively selling stock to investors. As evidenced by the Department of
Corporations documents (Exhibit 3) Biobanc sold over $7.5 million worth of stock
during the term of the Warrant. ROB repeatedly requested a copy of the
Investment Memorandum[2] under which the stock was being sold. It appeared
that Biobanc's management wanted to "run out the clock" on the Warrant.

The nature of this Complaint is that ROB should have the option to perform a
cashless exercise of the Warrant at the difference between the valuation in the
Warrant ($10 million in one contract and $12.5 million in the other) and the
valuation that Biobanc was selling stock at in its Investment Memorandum.
There is clearly a market for Biobanc's stock as over $7.5 million of stock has
been sold. The Memorandum was clearly withheld so that ROB could not
exercise his Warrant. In addition, it is likely that the Warrant was not disclosed to
investors which would be a direct violation of California and US securities law.
ROB directly requests that the Department of Corporations investigate these
violations and clearly deceptive behavior by Biobanc's management regarding
the Warrant.

Details of the Complaint:

I started working with Biobanc owned by Thomas B. O'Brien, Patrick Rambaud
and Dr. Bob Keller of the Keller Medical Institute in January 2006, and received a
contract in March of that year. Please see Exhibits 1 and 2 (original

---

[1] The second contract was for a Warrant for two (2) percent of the company at a valuation of
$12.5 million. The difference between the two contracts was never explained.
[2] Under California and US securities laws the Memorandum had to have filed to satisfy Blue Sky
requirements.

contract). Patrick Rambaud had been working with the Pasteur Medical Institute in France. They (the Pasteur Institute) had come up with multiple treatments using a persons own white blood cells (WBC), by modifying them with amino acids to cure multiple cancers, herpes as well as other medical conditions. They (the above mentioned parties) wanted me to set up a cryogenic storage facility, and operations for them. This included working with the architect, the town council, site owners, liquid nitrogen suppliers, the machines used including the cryogenic storing device, separation device, type of centrifuge, as well as laboratory set up and protocol for extracting the blood and also a method of selling the leftover blood. Please see Exhibits 4 through 9 (letters about set up).

I even originated the tag line "Preserving Your Future" which they use on the web site www.biobancusa.com , and letterhead. I did all of this for them and the site was set up as planned. Thomas B. O'Brien decided to sell his part of the venture, and it was taken over by Robert "Bo" Hayner, Patrick Rambaud and Robert Keller on May 17, 2006. Please see Exhibit 2 (second contract). The investors were Robert "Bo" Hayner who became CEO and Rob Thomas who became CFO. I worked with them for a couple months giving them all of my research and data and generally educating them all. I was led to believe that I would continue working for them, but as it turned out they weren't interested in employing my services any longer, and to find out what my Warrant was worth. Please see Exhibits 10 and 11(letter dated 5/18/06 4:06 pm and response dated 5/18/06 6:42 pm).

After finding out they would not employ me I asked if they would buy a percentage of my Warrant, please see Exhibit12 (letter dated 6/12/06 3:57 pm), I got a response from Robert Thomas offering to buy 1%, please see Exhibit 13 (letter dated 6/13/06 10:08 am). My response was that I would keep my Warrant, and that I would cash it in at a later date. Please se Exhibit 14 and 15 (letter dated 6/13/06 12:37 pm and response dated 6/13/06 2:12 pm).

While Dr. Bob Keller was still talking with me I was invited to the grand opening starring Clint Eastwood and other dignitaries. Please see Exhibit 16 (letter dated 10/15/06 6:14 pm). However soon after that, and near the date, I was snubbed never to be spoken to again by Dr. Bob Keller. Then I communicated via e-mails to Rob Thomas checking on their progress and again asking about the value of my Warrant only to find out that "clearing my Warrant was less important" to them see Exhibits 17 and response 18 (letter dated 3/31/07 2:42 pm and response on same page dated 4/1/07 9:16 am). I called back that I was going to wait to sell it, and got an e-mail response stating that I could "redeem it in the future". Please see Exhibit 19 (letter dated 5/18/06 5:42 pm)   I kept up with Rob Thomas on the progress. Please see Exhibits 20 and 21 (letter dated 8/2/07 10:39 pm with response on the same page 8/2/07 9:32 am). On, or about, December 10th I called Robert Thomas again and left a message asking for a call back, and received an e-mail from Robert Thomas saying that he was no longer with

Biobanc, and that he would forward my info to the new controller. Please see Exhibit 22 (letter dated 12/10/07 6:56 pm).

I did not hear from the "new controller" for several months I called Biobanc and asked who had replaced Robert Thomas. I was told that his name is Arthur A. Sutton. I then wrote him a letter asking about their progress, and that I wanted to speak with him about my Warrant. Please see Exhibit 23 (letter dated 1/10/08 12:29 pm). I got no response. So I wrote to Robert Hayner CEO. In the letter I asked how things were going, and that I would consider selling my Warrant for $300,000.00. Please see Exhibit 24 (letter dated 4/6/08 7:06 pm). Again no response, so I sent e-mails asking if he had received my previous e-mail. Please see Exhibits 25 and 26 (letters dated 4/15/08 1:50 pm and 4/15/08 4:50 pm)). I then sent a letter to Arthur A. Sutton requesting a financial report, and a copy of my Warrant (I don't have a copy of this letter). I Received a letter, but I didn't get the information I had requested (I don't have a copy of this letter).

I then sought counsel from my brother Dr. John N. O'Brien and he advised me to send a certified letter to him. Please see Exhibits 27 and 28 (letter dated 8/1/08 and return receipt card signed 8/8/08). In response I received a copy of the bylaws and a stock subscription agreement. Please see Exhibits 29 and 30. This was followed by two letters from Arthur A. Sutton. The first stating that they were reviewing the Warrant Exhibit 31 (letter dated 7/9/08). The second saying I have no right to the information I requested, but did send the aforementioned bylaws and stock subscription agreement. Please see Exhibit 32 (letter dated 7/10/08).

Due to the fact that they would not give me a copy of the Warrant I contacted Robert J. Cassandro, Esq. who sent a certified letter to Arthur A. Sutton requesting my Warrant. Please see Exhibit 33 (letter dated 11/13/08). Since there was no response to his letter and multiple phone calls to Arthur A Sutton my brother Dr. John N. O'Brien began calling Arthur A. Sutton.

According to Dr. O'Brien he attempted to contact Mr. Sutton with no success. After several calls he then called Brian D. Call Esq. Biobanc's issuer representative to the Department of Corporations on February 11, 2009. He explained that he had seen that stock sales that were filed and was particularly upset that Biobanc's management would not respond to ROB's request for information concerning the Warrant. He made the threat that he would assist in the filing of a complaint with the Department of Corporations if he did not receive a call very shortly. Mr. Sutton called on February 12, 2009 leaving a voicemail to which Dr. O'Brien responded the next day.

As reported by Dr. O'Brien, several phone calls ensured and Mr. Sutton was very friendly and he provided a copy of the contract in which the Warrant was memorialized and requested that ROB pay the $10 charge for issuing the Warrant. He also stated that he was going to meet with Mr. Hayner and would

get back to him right away.  No call ever came and subsequently Mr. Sutton refused to come to the phone when called.

I then sent a certified letter to Arthur A. Sutton with a check for $10.00 for my Warrant which was cashed. Please see Exhibits 34 through 38 (certified return receipt, copy of envelope, copy of airbill and receipt, copy of check and copy from my back showing that the check was cashed). After Arthur A. Sutton said he received the check, and cashed it we have not received any further contact by phone, e-mail or letter.

I believe that all of this evidence points to the conclusion that Biobanc's management purposefully mislead me and refused legitimate business contacts in an effort to "run out the clock" on my Warrant so that it would not be issued, exercised or even disclosed.  It is my position that the three year term on the Warrant will begin when it is issued.  Further, given the deceptive practices of Biobanc's management I request the settlement be to demand and order a cashless exercise of the Warrant based on the valuation in the Investment Memorandum which must have been filed with the Department of Corporations to satisfy Blue Sky requirement of California and US securities laws.

Thank you,

Robert E. O'Brien

# EXHIBIT E

## KRAEMER, BURNS, MYTELKA, LOVELL & KULKA, P.A.

COUNSELORS AT LAW

675 MORRIS AVENUE

SPRINGFIELD, NEW JERSEY 07081

TELEPHONE: 973 912-8700

FACSIMILE: 973 912-8602

WEBSITE: WWW.KRAEMERBURNS.COM

JOHN A. AVERY
DOUGLAS E. BURNS
ELEONORE KESSLER COHEN
WAYNE D. GREENFEDER
WALDRON KRAEMER
ELLEN B. KULKA
JOAN A. LOVELL
ROBERT S. MARCUS
ARNOLD K. MYTELKA
PATRICIA E. ROSENBERG
DIANE STOLBACH
SCOTT B. STOLBACH

OF COUNSEL
MICHAEL S. BURNS

DANIEL G. KASEN
(1905-1990)

December 17, 2009

Colin G. Bell, Esq.
Hankin Sandman & Palladino
30 South New York Avenue
Atlantic City, NJ 08401

RE:   Robert O'Brien v. BiobancUSA, et al
      **Case No. 09-2289 RBK/KMW**

Dear Mr. Bell:

This letter provides for the issuance of 2% of the common stock of Biobanc USA to Robert O'Brien.

In February 2009, Biobanc USA received a check dated February 19, 2009 in the amount of $10.00 from Robert O'Brien as consideration for a warrant to purchase stock pursuant to a May 17, 2006 Agreement, a copy of which is attached hereto. That Agreement provides as follows:

> "Robert O'Brien has a three (3) year warrant to purchase 2% of
> the common stock of BIO at 12.5 million valuation for $10."

We do not have a record of a formal written request being made by Robert O'Brien to exercise the warrant and purchase the stock. However, the Complaint in the above matter alleges that defendant refused to allow plaintiff to exercise his rights to purchase 2% of the stock. Therefore, we will deem the Complaint to be a formal request to exercise the warrant to purchase 2% of the stock of BioBanc USA.

In response to Plaintiff's demand, Defendant BioBanc USA shall issue 2000 shares of the stock of Biobanc USA which represents 2% of its issued and outstanding shares. This shall be a

KRAEMER, BURNS, MYTELKA, LOVELL & KULKA, P.A.

Colin G. Bell, Esq.
Page 2
December 17, 2009

cashless exercise with the only cash consideration being paid by Robert O'Brien is the $10.00 paid by his February 19, 2009 check.

If it is Mr. O'Brien's intent to make a cashless exercise of the warrant to purchase 2% of BioBanc USA, please have him execute and return a signed Subscription Agreement (copy enclosed) to my attention. I will have the shares issued and forwarded to you.

If is not Mr. O'Brien's intention make a cashless exercise of the warrant to purchase 2% of BioBanc USA, please notify me immediately.

Very truly yours,

Diane Stolbach

Diane Stolbach

enc.
ds/rh

AGREEMENT

Agreement regarding the relationship between Thomas B. O'Brien (hereinafter referred to as "TOB"), Immune Systems USA, a California corporation, dba BioBancUSA and BioBank of America, a California corporation (hereinafter collectively referred to as "BIO"), and Sankhia International INC.(hereinafter referred to as "SAN").

This Agreement is intended to amend and replace in their entirety the March 5, 2006 Agreement by and between BioBank of America, a California corporation and TOB and the Memorandum of Understanding dated January 22, 2006, between SAN, TOB and BIO and to establish all outstanding agreements between TOB, BIO and SAN.

In consideration of One Million Dollars ($1,000,000.00), TOB will release now and forever any claims or warrants he has against BIO or SAN which claims or warrants are in existence as of the date hereof. Seven Hundred Twenty Five Thousand ($725,000.00) will be wire transferred by SAN (corresponding to the two promissory notes the first for $625,000 and the second for $100,000) and Two Hundred Seventy Five Thousand ($275,000.00) from BIO to TOB not later than May 30, 2006, to an account identified by TOB.

SAN will issue a warrant for five percent (5%) of its common stock to TOB at a Twelve Million Five Hundred Thousand Dollar ($12,500,000.00) valuation for the sum of Ten Dollars ($10.00) paid and received. This warrant can be exercised by TOB anytime prior to May 16, 2007.

BIO is released from any and all of its obligations to reimburse and/or pay for TOB's expenses to include but not be limited to: house lease in the monthly amount of $3,200.00 and a one-time $20,000.00 fee for all other expenses related to TOB's expenses incurred on behalf of BIO.

The promissory notes between BIO, SAN and TOB will be considered paid in full as a result of the Seven Hundred Twenty Five Thousand ($725,000.00) payment by SAN to TOB.

TOB confirms his resignation from employment and as a member of the Board of Directors of BIO effective March 5, 2006.

Rob O'Brien's has a 3 year warrant to purchase 2% of the common stock of BIO at a 12.5 million valuation for $10.

1

TOB hereby releases SAN and BIO from any and all claims whether in existence now or in the future, including claims which would otherwise be barred in accordance with the provisions of California Civil Code Section 1542 arising out of any relationship with BIO and/or SAN and their shareholders, directors, officers, employees or agents.  California Civil Code Section 1542 provides as follows:

> Section 1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

TOB

Dated: 5-17-06

Thomas B. O'Brien

SANKIA

Dated: MAY 17 2006

By: _____
Patrick Rambaud
Chief Executive Officer

IMMUNE SYSTEMS USA
A California Corporation
dba BioBank USA

Dated: MAY 17 2006

By: _____
Robert E. Hayner
Chief Executive Officer

BIOBANK OF AMERICA
A California Corporation

Dated: 5/17/06

By: _____
Robert Keller
President

2

---

**Name of Subscriber**

## STOCK SUBSCRIPTION AGREEMENT

### (ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)

[BioBancUSA]

Ladies and Gentlemen:

The subscriber named above (the "Subscriber") tenders herewith to BioBancUSA, a California corporation (the "Company") a subscription to acquire 2000 Common Shares of the Company with a value of $200.00 per share (the "Shares") for the warrant exercise price of $10.00. The Subscriber hereby furnishes the Company the information, and makes the representations and warranties, set forth herein to indicate whether the Subscriber is a suitable subscriber for the Shares. <u>Subscribers should complete the Investor Qualification Questionnaire (the "Questionnaire") before completing this Agreement.</u> As a condition precedent to investing in the Company, the Subscriber hereby represents, warrants, covenants and agrees as follows:

The Subscriber understands that the Shares are being offered and sold without registration under the Securities Act of 1933, as amended (the "Act"), or any state securities laws, including, without limitation, the California Corporate Securities Law of 1968, as amended (the "California Act") in reliance upon the private offering exemption contained in Section 4(2) of the Act and Regulation D thereunder and certain exemptions from any applicable state securities laws, and that such reliance is based in part on the representations made and information herein supplied and in the Questionnaire. For the foregoing reasons, the Subscriber represents and warrants that the statements checked below and the information stated herein are true, accurate and complete to the best of Subscriber's knowledge and belief, and the Subscriber agrees to notify the Company and supply corrective information promptly if, prior to the consummation of Subscriber's purchase of the Shares, any of such information becomes inaccurate or incomplete.

1.      The Subscriber represents, warrants and certifies that the Subscriber has completed the Questionnaire relating to the Subscriber's ability to bear the risks of an investment in the Company and the Subscriber's suitability as an investor in the Company and hereby affirms the accuracy and completeness of the Subscriber's answers in the Questionnaire. The

Subscriber is (i) the sole party in interest to this investment, (ii) at least 21 years of age, (iii) a United States citizen (or is treated as a United States citizen for federal income tax purposes) or a bona fide resident of the United States, and (iv) a bona fide resident and domiciliary (not a temporary or transient resident) of the jurisdiction set forth on the signature page of this Agreement.

2.      The Subscriber certifies, under penalties of perjury, that (i) the social security number set forth in the Questionnaire is true, correct and complete, and (ii) the undersigned is not subject to backup withholding either because the Subscriber has not been notified that he is subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified the Subscriber that he is no longer subject to backup withholding.

3.      The Subscriber confirms that the Subscriber did not become aware of, or obtain information regarding, the offering of the Shares as a result of (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, (ii) any seminar or meeting attended by the Subscriber and other potential investors or (iii) any other form of general solicitation or general advertising.

4.      The Subscriber understands that the purchase price for the Shares subscribed for as set forth on the signature page of this Agreement has been previously paid in full.

5.      The Subscriber acknowledges that upon acceptance of this subscription by the Company (which is solely in the discretion of the Company) the Subscriber shall have no right to withdraw this subscription. The Subscriber agrees to execute any and all further documents necessary in connection with the Subscriber's investment in the Shares.

6.      The Subscriber is aware that no federal or state regulatory agency has made any finding or determination as to the fairness for public or private investment, nor any recommendation or endorsement, of the purchase of the Shares as an investment.

7.      The Subscriber confirms that the Subscriber understands, and has fully considered for purposes of this investment that (i) the Company has only recently brought its product(s) to market and does not yet have any significant financial or operating history, (ii) the Shares are a speculative investment which involves a high degree of risk of loss by the Subscriber of Subscriber's investment therein, (iii) the tax matters and legal considerations relating to the Company and the investment in the Shares are complex and involve uncertainties (including the possibility that applicable law and tax treatment may change) and certain risks and may differ for the Subscriber depending on the Subscriber's circumstances, and (iv) there will be no public market for the Shares (and this Agreement contains restrictions thereon) and, accordingly, it may be difficult for the Subscriber to liquidate the Subscriber's investment in case of emergency, if possible at all, and any transfer of the Shares may result in adverse tax consequences to the Subscriber.

8.      The Subscriber confirms that, at a reasonable time prior to making the Subscriber's decision to purchase the Shares subscribed for, the Company has given the Subscriber, and the Subscriber's advisors, including the Subscriber's professional tax and other advisors, the opportunity to examine all documents, including the Company's Articles of

Incorporation and By-laws, copies of which will be provided, respectively, and to ask questions of, and to receive answers from the Company or any person(s) acting on its behalf concerning the terms and conditions of the offering and to obtain any additional information, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense to evaluate the Shares, the risks associated with an investment in the Company and the prior experience of the Company's management.

9.     The Subscriber understands that any financial forecasts or projections or illustrations of hypothetical transactions prepared by the Company were prepared on the basis of the assumptions and hypotheses stated therein. Future operating results are impossible to predict and no representations can be or are being made with respect to the future accuracy or completeness of any such forecasts, projections or illustrations.

10.    The Subscriber has the knowledge and experience in financial and business matters, in general, and this investment, in particular, to be capable of evaluating the risks and merits of an investment in the Company. The Subscriber recognizes the speculative nature and risks of loss associated with this investment and that the Subscriber may suffer a complete loss of the Subscriber's investment. The Subscriber's overall commitment to investments that are not readily marketable is not disproportionate to the Subscriber's net worth, and the Subscriber's investment in the Company will not cause that overall commitment to become excessive. The Shares subscribed for hereby constitute an investment that is suitable and consistent with the Subscriber's investment program and the Subscriber believes that the Subscriber's financial situation enables the Subscriber to bear the risks of this investment. The Subscriber represents that the Subscriber has adequate resources to provide for the Subscriber's current needs and contingencies and has no need for liquidity in this investment.

11.    The Subscriber represents and warrants that the Shares subscribed for are being acquired by the Subscriber solely for the Subscriber's own account, for investment purposes only, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; the Subscriber has no agreement or other arrangement, formal or informal, with any person to sell, transfer, pledge or subject to any lien any part of the Shares subscribed for or which would guarantee the Subscriber any profit or protect the Subscriber against any loss with respect to the Shares; the Subscriber has no plans to enter into any such agreement or arrangement. The Subscriber understands that the Subscriber must bear the economic risk of Subscriber's investment for an indefinite period of time because the Shares have not been registered under the Act, or qualified under the California Act, or any other applicable state securities laws and, therefore, cannot be resold or otherwise transferred unless subsequently registered under the Act, or qualified under the California Act, and any other applicable state securities laws (which the Company is not obligated to do), or an exemption from such registration is available. The Subscriber further understands that the exemption under Rule 144 under the Act may be unavailable because of the conditions and limitations of such rule. The Subscriber acknowledges that the certificates representing the Shares will bear legends substantially in the following form:

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL OR OTHER ASSURANCES SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED THEREUNDER. THE SHARES ARE SUBJECT TO TRANSFER RESTRICTIONS AS SET FORTH IN THE STOCK SUBSCRIPTION AGREEMENT WITH THE COMPANY.

13.     The Subscriber is aware that the Company has been and is relying upon the representations and warranties set forth in this Agreement and the Questionnaire, in part, in determining whether the offering will qualify for an exemption from the registration provisions of the Act, the California Act, and applicable state securities laws. All of the information which the Subscriber has furnished the Company herein or therein or previously with respect to the Subscriber's financial position and business experience is correct and complete as of the date of this Agreement, and, if there should be any material change in such information prior to the termination of the subscription period for the Shares, the Subscriber will immediately furnish such revised or corrected information to the Company. The Subscriber agrees to indemnify and hold harmless the Company and its affiliates and each officer, director, stockholder and employee thereof and their successors and assigns, from and against any and all losses, damages, liabilities or expenses, including costs and attorneys fees, incurred by reason of any misrepresentation by the Subscriber in this Agreement, the Questionnaire or any other subscription documents, or any breach of the Subscriber's warranties or the Subscriber's failure to fulfill the Subscriber's covenants in this Agreement, the Questionnaire or any other subscription documents. The Subscriber agrees that the representations, warranties and covenants herein shall survive the Subscriber's purchase of the Shares as well as any acceptance or rejection of a subscription for the Shares.

14.     Except as permitted in the Bylaws, Subscriber shall not sell, transfer or dispose of the Shares to any third person other than (a) the Company or (b) another shareholder of the Company.

15.     Subscriber acknowledges that the Restrictions on Transfer of Shares as contained in Article IX of the Bylaws of the Corporation which contain a Right of First Refusal to purchase the stock of a selling shareholder, which Right of First Refusal is in favor of the Corporation and subsequently in favor of each nonselling shareholder. The terms and conditions of Article IX, "Restriction of Transfer of Shares" of the Bylaws of the Corporation are incorporated herein as if set forth in its entirety.

-4-

16.     In the event persons holding or controlling in excess of fifty percent (50%) of the issued shares of the Company elect to sell (the "Selling Shareholders") all or substantially all of their shares of the Company to a bona fide third party purchaser (a "Purchaser"), the Selling Shareholders shall deliver written notice to the Subscriber of the terms and conditions of such sale (a "Sale Notice"). The Subscriber shall, upon direction from the Selling Shareholders, sell all of Subscriber's Shares to the Purchaser, at the same time and upon the same terms and conditions as set forth in the Sale Notice. In addition, the Subscriber shall have the irrevocable right to proportionally participate in such sale to the Purchaser, at the same time and upon the same terms and conditions as set forth in the Sale Notice.

*[the balance of this page is intentionally blank]*

CH02/ 22450609.2

## SIGNATURE PAGE

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, (THE "ACT") INCLUDING, WITHOUT LIMITATION, THE CALIFORNIA CORPORATE SECURITIES LAW OF 1968, AS AMENDED (THE "CALIFORNIA ACT") OR APPLICABLE STATE SECURITIES LAWS.  THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE ACT, THE CALIFORNIA ACT AND ANY OTHER APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL OR OTHER ASSURANCES SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED THEREUNDER.

In consideration of the Company's acceptance of this Agreement, the undersigned Subscriber accepts, adopts and agrees to be bound by all of the terms, conditions and representations and warranties in this Agreement.

Total Subscription

2000 shares of Common Stock with a value of $200.00 per share, at $10.00 warrant exercise price for a total investment of $10.00

Name of Subscriber:_____

Signature:_____

Title (if other than Individual):_____

Dated:_____

Address: _____

_____

_____

-6-

CH02/ 22450609.2

**CONFIDENTIAL**

**INVESTOR QUALIFICATION QUESTIONNAIRE**

You are being requested to answer questions in connection with the proposed offer and sale of common stock (the "Common Stock") in BioBancUSA, a California corporation (the "Company"). The Common Stock is being offered and sold without registration under the Securities Act of 1933 as amended (the "Act"), including, without limitation, the California Corporate Securities Law of 1968, as amended (the "California Act"), or any other state securities laws, in reliance on the private offering exemption contained in Section 4(2) of the Act and Regulation D thereunder, the exemption from registration provided for under the California Act, specifically California Corporations Code Section 25102(f) and certain exemptions from other state securities laws. The availability of such exemptions depends, in part, on a determination that you are able to fend for yourself in the transaction and do not require the protections afforded by registration.

The information supplied will be used in determining whether you meet such criteria. The information will be kept confidential and will not be disclosed except to the Company's counsel and, if required, to governmental and regulatory authorities.

_____

*Subscriber's Name*

_____

*Street Address (Residence)*

_____

| | | |
|---|---|---|
| *City (Residence)* | *State (Residence)* | *Zip Code* |

Telephone No. _____

*(Include Area Code)*

Social Security Number _____

**Please complete the following:**

Age: _____

Principal occupation or employment during last five years:_____

    a.  Is your net worth greater than $1,000,000? (For purposes of this question, you may <u>include</u> your spouse's net worth and may <u>include</u> your equity in any real estate you own; i.e., the fair market value of the real estate, furnishings and automobiles less the amount of any mortgage or other lien.)

            Yes____     No____

    b.  Was your individual income (not joint with spouse) during each of the past two years in excess of $200,000 and do you reasonably expect that in the current year it will be in excess of $200,000?*

            Yes____     No____

    c.  Was your and your spouse's joint income during each of the past two years in excess of $300,000 and do you reasonably expect that in the current year such joint income will be in excess of $300,000?*

            Yes____     No____

* Income may be calculated by starting with Adjusted Gross Income and adding the deductions taken for long-term capital gains, depletion, partnership losses allocated to you and IRA and/or Keogh plans.

IF THE SUBSCRIBER IS A NATURAL PERSON AND YOU ANSWERED YES TO EITHER (a), (b) or (c) ABOVE, YOU ARE AN ACCREDITED INVESTOR. (There may be other persons or entities who may be accredited investors.)

**If Subscriber is a trust, please complete the following:**

Type of Trust:     Intervivos  _____     Testamentary  _____

Date and state of formation_____

Name of trustee(s) _____

Name of beneficiary(ies) _____

List financial and business experience of trustee(s)_____

Was the trust formed for the specific purpose of acquiring
this investment in the Company?                  Yes____  No____

Are the total assets of the trust in excess of $5,000,000?    Yes____  No____

-2-

**EXHIBIT 1**

**RULE 501(a) OF REGULATION D**

a. *Accredited investor.* *Accredited investor* shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

    1.  Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

    2.  Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

    3.  Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

    4.  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

    5.  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

    6.  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

    7.  Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) and

    8.  Any entity in which all of the equity owners are accredited investors.

-3-